**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PENNSYLVANIA COUNTY** | : | |
| **RISK POOL (PCORP), COUNTY** | : | **Civil Action No. 1:07-cv-00898** |
| **OF MONROE, PENNSYLVANIA,** | : | |
| **and COUNTY OF BEAVER,** | : | **(Chief Judge Kane)** |
| **PENNSYLVANIA,** | : | |
| | : | |
| **Plaintiffs and** | : | |
| **Counterclaim Defendants** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **NORTHLAND INSURANCE,** | : | |
| | : | |
| **Defendant and** | : | |
| **Counterclaim Plaintiff** | : | |

**MEMORANDUM**

Before the Court are cross-motions for summary judgment brought, on the one hand, by

Plaintiffs Pennsylvania Counties Risk Pool;[1] County of Monroe, Pennsylvania; and County of

Beaver, Pennsylvania and, on the other, by Defendant Northfield Insurance.[2]  (Doc. Nos. 29, 32.)

For the reasons that follow, the Court will grant Defendant Northfield Insurance's motion for

summary judgment and deny Plaintiffs' cross motion.

**I.     JURISDICTION**

Plaintiff Pennsylvania Counties Risk Pool ("PCoRP") is an intergovernmental trust

organized pursuant to title 28, sections 2301–16 of the Pennsylvania Consolidated Statutes,

53 Pa. Cons. Stat. Ann. §§ 2301–16 (West 2008), with its offices in Harrisburg, Pennsylvania.

---

[1] Pennsylvania Counties Risk Pool is incorrectly designated "Pennsylvania County Risk Pool" in the caption and throughout the complaint.  See Indemnity Ins. Co. of North America v. Motorists Mut. Ins. Co., 710 A.2d 20, 21 (Pa. 1998).

[2] Northfield Insurance is incorrectly designated "Northland Insurance" in the caption and throughout the complaint.  (Doc. No. 20 at 1.)

(Doc. No. 1 at 1.)  Plaintiffs County of Monroe, Pennsylvania, ("Monroe") and County of

Beaver, Pennsylvania, ("Beaver") are political subdivisions of the Commonwealth of

Pennsylvania, 16 Pa. Stat. Ann. § 201.  Defendant Northfield Insurance ("Northfield") is an Iowa

corporation with its principal place of business in St. Paul, Minnesota.  (Id.)  Plaintiffs claim

monetary damages in excess of $113,799.71.  (Id. at 12.)  Because the parties are citizens of

different states and the amount in controversy exceeds $75,000, the Court has jurisdiction over

this action pursuant to 28 U.S.C. §§ 1332, 2201.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted

when "the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56.  As the Supreme

Court of the United States has explained, this standard, by its very terms, "provides that the mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine*

issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).   In

making this determination, the Court must "view the facts in the light most favorable to the

nonmoving party and draw all inferences in that party's favor."  Norfolk S. Ry. Co. v. Basell

USA, Inc., 512 F.3d 86, 91 (3d Cir. 2008) (quoting Abramson v. William Paterson Coll. of N.J.,

260 F.3d 265, 276 (3d Cir. 2001)).   Thus, "summary judgment will not lie if the dispute about a

material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  For the purposes of summary

judgment, a factual dispute is "material" only if the dispute, as a matter of substantive law, has the potential to affect the outcome of the suit. <u>Id.</u> at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." <u>Id.</u> Absent a genuine issue of material fact, the determination of coverage under an insurance contract is a question of law to be decided by the Court. <u>Pacific Indem. Co v. Linn</u>, 766 F.2d 754, 760 (3d Cir. 1985).

## III . BACKGROUND

### A.    Factual Background

PCoRP is an intergovernmental trust, the purpose of which is to provide various insurance coverages to Pennsylvania counties by "pooling," or sharing, risk and resources. (Doc. No. 29 at 1 ¶ 2.) Two of those counties are Monroe and Beaver. (<u>Id.</u> at 1 ¶ 3.) At some point prior to June 1, 2000, PCoRP set aside a reserve of $100,000 and purchased from Northfield a Public Entity All Lines Aggregate Insurance Policy (the "Policy"), a reinsurance policy for all liability above the reserve and up to $1,000,000. (<u>Id.</u> at 1 ¶ 4.) PCoRP provided insurance coverage to Monroe and Beaver under the Policy from June 1, 2000, to June 1, 2001. (<u>Id.</u>)

On or about September 8, 2000, PCoRP received notice of a class-action lawsuit seeking injunctive and declaratory relief that had been instituted against numerous parties, including Plaintiffs Monroe and Beaver, in the United States District Court for the Eastern District of Pennsylvania. (<u>Id.</u> at 2 ¶ 5.) The lawsuit is captioned <u>Anderson, et al v. County of Monroe, County of Beaver, et al.</u> ("Anderson Lawsuit"). In their complaint, the plaintiffs—adults caring for the children of relatives and friends, or "kinship care givers"—alleged that various state and county agencies and officials had "failed to provide mandated financial support, in the form of

per diem foster care payments, to abused and neglected children in their care." (Doc. No. 29-4 at 3 ¶ 1–2.)

David Harman ("Harman"), a claims supervisor with the County Commissioners Association of Pennsylvania ("CCAP"), the umbrella organization that administers PCoRP, alerted Northfield to the Anderson Lawsuit in a report dated January 14, 2002. (Id. at 2–3 ¶ 6; see also Doc. No. 29-5 at 2.) Northfield acknowledged receipt of the report in a letter dated July 19, 2002 ("Reservation-of-Rights Letter"), whereby Northfield advised PCoRP that it was "reserv[ing its] rights to refuse indemnification of any damages and expense that PCoRP becomes legally obligated to pay on behalf of Monroe or Beaver . . . because the policy conditions have not been met because CCAP did not immediately notify [it of the Anderson Lawsuit]." (Doc. No. 29-5 at 3.) Northfield further advised PCoRP that it was reserving its rights, under an exclusion applicable to the "Errors and Omissions" section of the Policy, "to refuse indemnification for losses PCoRP may be liable to pay that are based upon or attributable to Monroe or Beaver County gaining in fact any personal profit or advantage to which they [are] not legally entitled." (Id.) Finally, Northfield also advised PCoRP that it was reserving its rights, under Endorsement No. 17 (the "Endorsement") to the Policy, "to refuse indemnification for any costs or expense incurred by PCoRP that arise solely out of any awards of declaratory, injunctive, or equitable relief, including the cost of defending such actions as well as the attorneys' fees and expenses of the plaintiffs." (Id. at 4.) On September 16, 2002, PCoRP responded with a letter to Northfield seeking "a detailed explanation of how [Northfield] was

prejudiced" by the late notice, a issue which Northfield has since conceded.[3]  (Doc. No. 29 at 3

¶ 7; Doc. No. 29-6 at 2–4; Doc. No. 34 at 3 ¶ 7.)

During the pendency of the Anderson Lawsuit, Harman regularly apprised Northfield by

e-mail of the aggregate costs and expenses of defending against the lawsuit.  (Doc. No. 29 at 3

¶ 9; Doc. No. 34 at 4 ¶ 9.)  The Anderson Lawsuit ultimately settled, with the result that PCoRP

incurred "a total aggregate cost, including the settlement and attorneys' fees and litigation

expenses," of $213,799.71.  (Doc. No. 29 at 4 ¶ 11.)  At some time point prior to November 7,

2006, PCoRP submitted to Northfield a claim for $113,799.71, the total aggregate cost of

defending against the suit less the $100,000 reserve.  In a letter dated November 7, 2006,

Northfield informed PCoRP that it was not obligated to provide coverage for the claim under the

Policy ("Disclaimer Letter"), and asserted four reasons in support of its decision:

> (1)    It is our position there is no coverage under [the
> comprehensive general liability section of the Policy] for any
> damages or expenses that PCoRP is obligated to pay on behalf of
> Monroe or Beaver because the damages or expenses:
>
> > Do not fall within the scope of ultimate net loss caused by
> > bodily injury, property damage, personal injury, advertising

---

[3] Plaintiffs allege that "a representative of [Northfield] admitted to David Harman and to [PCoRP's] corporate counsel . . . that there were claims made in the lawsuit that did not involve strictly injunctive or declaratory relief" during a conversation conducted by telephone on October 14, 2002.  (Doc. No. 29 at 3 ¶ 8.)  As proof, Plaintiffs offer an unauthenticated letter written by PCoRP's corporate counsel and addressed to Northfield's representative, purporting to memorialize certain aspects of the conversation, including an acknowledgment by the representative that "other claims . . . would lie within the coverage of the insurance contract." (Doc. No. 29-7 at 2.)  Northfield, for its part, admits that the conversation occurred, but denies that its representative made any such statement vis-à-vis the nature of the "other claims." (Doc. No. 34 at 3–4 ¶ 8.)  Because the disputed statement would not, as a matter of substantive law, "affect the outcome of the suit" and is therefore immaterial, the Court shall decide the instant motions by reference to the Policy and the underlying complaint exclusively.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

injury, products liability, and/or completed operations, host/liquor liability or incidental malpractice or Violation of Civil Rights or First Aid; or

Do not arise out of performance of law enforcement activities; or

Arose out of acts of fraud or dishonesty committed by the Assured.

(2)     It is our position there is no coverage under the [Policy] for any damages or expenses that PCoRP is obligated to pay on behalf of Monroe or Beaver because the damages or expenses were:

Based upon or attributed to Monroe and Beaver County gaining in fact any personal profit or advantage to which they were not legally entitled; or

Brought about or contributed to by fraud, dishonesty, or criminal act of an Assured.

(3)     It is our position there is no coverage under the [Policy] for any damages or expenses that PCoRP becomes legally obligated to pay on behalf of Monroe or Beaver because the policy conditions have not been met in that CCAP did not immediately notify Underwriters of this occurrence.

(4)     It is our position that there is no coverage under the [Policy] for any costs or expenses incurred by PCoRP because the costs or expenses arise solely out of any awards of declaratory, injunctive, or equitable relief, including the cost of defending such actions as well as the attorneys fees and expenses of the plaintiff.

(Doc. No. 29-8 at 3–6.)  In stating its positions, Northfield referred PCoRP to the language of the

Policy and the Endorsement.  (Id.)

## B.     Procedural Background

Plaintiff commenced this action by filing a complaint on May 17, 2007.  (Doc. No. 1.)

On August 21, 2007, the Court referred this action to mediation, and on December 12, 2007, the

mediator assigned to this case reported that mediation had been unsuccessful.  On January 10,

6

2008, Defendant Northfield Insurance filed an answer, together with a counterclaim. Plaintiff

and Defendant each filed cross motions for summary judgment on June 23, 2008.  (Doc. Nos. 29,

32.)  On October 30, 2008, the Court entered an order staying this action pending adjudication of

the pending cross motions for summary judgment.

## IV.   DISCUSSION

In its motion for summary judgment, Plaintiffs contend that the "Insuring Agreement and

the Definitions contained in the [Policy], clearly provide coverage for the claims made in the

Anderson Lawsuit."  (Doc. No. 30 at 7–8.)  Characterizing Northfield's obligations under the

Policy as arising from the duty to defend rather than the relatively limited duty to indemnify,

Plaintiffs maintain that "the duty to defend attaches when the allegations of the complaint against

the insured 'may potentially come within the policy's coverage.'" (Id. at 10 (quoting Allstate Ins.

Co. v. Drumheller, 185 F. App'x. 152, 154 n.2 (3rd Cir. 2006)).)  Northfield recognized the

breadth of this duty, Plaintiffs contend, inasmuch as "it did not disclaim but merely provided a

reservation of rights," and Northfield is, therefore, "responsible for all defense costs up to the

date of the disclaimer letter."  (Id. at 11.)

For its part, Northfield contends that under the policy it had no duty to defend Plaintiffs

in the Anderson Lawsuit because the policy was one for indemnification and not defense.  More

fundamentally, Northfield contends that the Policy expressly excluded coverage for underlying

lawsuits that seek only declaratory or injunctive relief, and Northfield maintains that the

Anderson Lawsuit sought only such relief.  Moreover, Northfield asserts that the Policy

expressly excludes coverage for suits in which the insured received a profit or advantage for

which it was not lawfully entitled.  Northfield argues that this provision of the Policy also

operates to exclude Plaintiff's claim.

### A.        Duty to Defend vs. Duty to Indemnify

A federal court sitting in diversity is required to apply the substantive law of the state

whose laws govern the action.  Robertson v. Allied Signal, Inc., 914 F.2d 360, 378 (3d Cir.

1990). The principles governing the interpretation of a contract of insurance in Pennsylvania are

"familiar and well settled."  Standard Venetian Blind Co. v. American Empire Ins. Co.,

469 A.2d 563 (Pa. 1983).  "Where a provision of a policy is ambiguous, the policy provision is

to be construed in favor of the insured and against the insurer, the drafter of the agreement.

Where, however, the language of the contract is clear and unambiguous, a court is required to

give effect to that language."  Id. (citing Mohn v. American Casualty Co. of Reading,

326 A.2d 346 (Pa. 1974).  An insured may not complain that his or her intentions "were

frustrated by policy limitations which are clear and unambiguous."  Britamco, 636 A.2d at 651.

Pennsylvania courts have consistently upheld exclusionary clauses that clearly and

unambiguously limit coverage.  See, e.g., Paylor v. Hartford Ins. Co., 640 A.2d 1234 (Pa. 1994);

Neil v. Allstate Ins. Co., 549 A.2d 1304 (Pa. Super. Ct. 1988), allocatur denied, 559 A.2d 38

(Pa. 1989).  The insurer, however, bears the burden of proving that any exclusions or limitations

apply.  Koppers Co., Inc. v. Aetna Cas. and Sur. Co., 98 F.3d 1440, 1446 (3d Cir.1996)

(applying Pennsylvania law); Madison Const. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100,

106 (Pa. 1999).

An insurer's duty to defend, which requires the insurer to cover the costs of defending the

insured against a lawsuit, is separate and distinct from the duty to indemnify an insured, which

ordinarily is not enforceable until the insured has sustained an actual loss, as by paying a judgment for a claim that comes within the scope of the policy.  See Key Handling Sys., Inc. v. Workers' Comp. Appeal Bd., 729 A.2d 109, 116 (Pa. Commw. Ct. 1999); see also Indemnity Ins. Co. of N. Am. v. Neel, 57 Pa. D. & C. 109, 113 (Ct. Cm. Pl. of Pa. 1947) (contrasting liability contracts with indemnity contracts).   Thus, the duty to indemnify does not arise until the insured is held liable for a claim actually covered by the insurance policy and such liability is conclusively established.  See USX Corp. v. Adriatic Ins. Co., 99 F. Supp. 2d 593, 611–12 (W.D. Pa. 2000); see also Winner Int'l Corp. v. Continental Cas. Co., 889 F. Supp. 809, 816 (W.D. Pa. 1994) ("While an insurer must defend its insured if the complaint alleges conduct that potentially falls within the scope of the policy, it must indemnify its insured only if liability is found for conduct that actually falls within the scope of the policy." (citing Allstate Ins. Co. v. Brown, 834 F. Supp. 854, 857 (E.D. Pa. 1993)).

It is well-settled law in Pennsylvania that where a policy "contains an obligation to defend, that obligation is triggered if the underlying complaint avers any facts that potentially could support a recovery under the policy, and once that obligation is triggered, the insurer has a duty to defend until the claim is confined to a recovery that the policy does not cover."  USX Corp., 99 F. Supp. at 611.  If there is no possibility that the claim could be covered by the policy, a declaratory judgment to the effect that the insurer has no duty to defend or indemnify is appropriate.  Britamco Underwriters, Inc. v. Stokes, 881 F. Supp. 196 (E.D. Pa. 1995).

Determining whether an insurer has a duty to defend an insured is a two-step process.  At the first step, the court must ascertain the scope of coverage under the policy.  Britamco Underwriters, Inc. v. Weiner, 636 A.2d 649, 651 (Pa. Super. Ct. 1994).  This inquiry is

independent of, and antecedent to, the question of duty to defend. <u>Lucker Mfg. v. Home Ins.</u>
<u>Co.</u>, 23 F.3d 808, 813–14 (3d Cir. 1994). "Traditional principles of insurance policy
interpretation control the inquiry . . . ," <u>id.</u> at 814, and the court's "primary goal in interpreting a
policy, as with interpreting any contract, is to ascertain the parties' intentions as manifested by
the policy's terms." <u>Kvaerner Metals v. Commercial Union Ins. Co.</u>, 908 A.2d 888, 896
(Pa. 2006). At the second step, the court must examine the "complaint to determine whether the
allegations set forth therein constitute the type of instances that will trigger coverage." <u>Kvaerner</u>
<u>Metals</u>, 908 A.2d at 897. The allegations of the underlying complaint against the insured "are to
be taken as true and liberally construed in favor of the insured." <u>Biborosch v. Transamerica Ins.</u>
<u>Co.</u>, 603 A.2d 1050, 1052 (1992). In making a determination, the court may not, however, look
beyond the four corners of the complaint. "[T]he rule everywhere is that the obligation of a
casualty insurance company to defend an action brought against the insured is to be determined
*solely* by the allegations of the complaint in the action." <u>Kvaerner Metals</u>, 908 A.2d at 896
(quoting <u>Wilson v. Md. Cas. Co.</u>, 105 A.2d 304 (1954)).

### B.      The Scope of Coverage Under the Policy

Section IV of the Policy contains the following provisions and definitions:

INSURING AGREEMENT

>   If during the Policy Period, any Claim is first made against the
>   Assured for a Wrongful Act, Underwriters will indemnify the
>   Assured, for all Loss incurred by the Assured by reason of any
>   Wrongful Act as hereinafter defined.

DEFINITIONS

>   A.      The term "Wrongful Act" shall mean any actual or alleged
>   error or mis-statement, omission, act of neglect or breach of
>   duty including misfeasance, malfeasance, and nonfeasance by

the Assured.  "Wrongful Act" includes actual or alleged violations of the United States Constitution or any State constitution, or any law affording protection for civil rights, provided coverage is otherwise afforded hereunder for such Wrongful Act.

B.      The term "Loss" shall mean:

(i)     damages, judgements, settlements, costs, charges and expenses incurred in the defence of claims, cost of attachment or similar bonds (but without any obligation on the part of Underwriters to apply for or furnish such bonds); and

(ii)    costs, charges and expenses incurred in connection with any governmental investigation provided that a Claim is brought against the Assured for a Wrongful Act that is or was a subject of said governmental investigation, and such Claim is otherwise covered by this Policy.

(Doc. No. 29-3 at 2.)  Section IV of the Policy is subject to the following exclusions, among

others:

## EXCLUSIONS APPLICABLE TO SECTION IV

This section shall not apply to any Claim made against the Assured:

A.      based upon or attributable to them gaining in fact any personal profit or advantage to which they were not legally entitled including remuneration paid in violation of law as determined by the Court;

B.      brought about or contributed to by fraud, dishonesty or criminal act of any Assured.

. . .

## ENDORSEMENT [No. 17]

It is hereby noted and agreed that coverage excludes any costs or expenses incurred by the Assured in any claim or suit seeking solely declaratory, injunctive, or equitable relief, including but not limited to any attorney's fees or expenses incurred to defend the claim or

suit.  Coverage also excludes any costs or expenses incurred in
compliance with orders providing declaratory, injunctive or equitable
relief, including but not limited to the attorneys fees and expenses of
the claimant.

(Doc. No. 29-3 at 2–3; Doc. No. 29-9 at 2.)

Thus, the Policy obligated Northfield to "indemnify" PCoRP for all "loss" incurred by
PCoRP by reason of any "wrongful act" on a "claims-made" basis.  A claims-made policy
protects the insured only for claims made during the life of the policy, whereas an "occurrence"
policy shields an insured from liability for any act done while the policy is in effect.  St. Paul
Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 535 n.3 (1978) (contrasting claims-made policies
with occurrence policies).  The use of the term "indemnify," which, as previously noted,
ordinarily describes an obligation enforceable only after the insured has sustained an actual loss,
is plainly at odds with the use of the term "loss," which the Policy defines in pertinent part as
"damages, judgements, settlements, costs, charges and expenses incurred in the defence of
claims."  (Doc. No. 29-3 at 2 (emphasis added).)  Presumably, the drafter meant that Northfield
would "indemnify" PCoRP not in the strict, technical sense of "reimburs[ing another] for a loss
suffered because of a third party's or one's own act or default," Black's Law Dictionary 783–84
(8th ed. 2004), but rather in the broad, lay sense of "mak[ing] compensation to [another] for
incurred hurt, loss, or damage," Webster's Third New International Dictionary 1147 (1993).
Whatever the drafter's intention, the Court must construe this ambiguity in favor of the insured
and, in so doing, finds that the Policy obligated Northfield to reimburse PCoRP for all damages,
judgements, settlements, costs, charges, and expenses that PCoRP incurred by reason of any
"wrongful act," as defined in the Policy, on a claims-made basis.

12

Although the term "wrongful act" is expansively defined as "any actual or alleged error or mis-statement, omission, act of neglect or breach of duty," the scope of coverage under the Policy was curtailed by numerous clear and unambiguous exclusions.  (Doc. No. 29-3 at 2.)  The first of these excluded claims "based upon or attributable to [the Assured] gaining in fact any personal profit or advantage to which [it was] not legally entitled including remuneration paid in violation of law as determined by the Court."  (Id.)  The second excluded claims "brought about or contributed to by fraud, dishonesty or criminal act of any Assured."  (Id. at 3.)  And the third, set forth in "Endorsement No. 17," excluded "any costs or expenses incurred by the Assured in any claim or suit seeking solely declaratory, injunctive, or equitable relief, including but not limited to any attorney's fees or expenses incurred to defend the claim or suit" (Doc. No. 29-9 at 2), as well as "any costs or expenses incurred in compliance with orders providing declaratory, injunctive or equitable relief, including but not limited to the attorneys fees and expenses of the claimant" (id.).  Stated another way, consequent to the endorsement, any duty to defend or duty to indemnify PCoRP could have arisen only in the context of a lawsuit that sought, in whole or in part, legal relief or compensatory damages.

### C.     The Anderson Lawsuit

The Court now turns to the complaint in the Anderson Lawsuit to determine whether the allegations set forth therein constitute the type of instances that will trigger coverage under the Policy.  Arguing against the "erroneous assumption" that the Anderson Lawsuit sought only the sort of equitable relief excluded by the endorsement, Plaintiffs assert that the kinship care givers sought compensatory damages, or, more particularly, that "the relief sought, in addition to other declaratory relief, was the payment of the alleged unpaid benefits, plaintiffs' costs and

reasonable attorney's fees, and other relief that the Court deemed appropriate." (Doc. No. 30 at 14–15; see also id. at 9.) Plaintiffs further assert, without citation to the underlying complaint, that "[t]he gist of the action was for the recovery of past foster care per diem payments that the plaintiffs alleged were owed to them and other members of their class pursuant to federal statutes . . . ." (Id. at 15.) Finally, Plaintiffs reach beyond the complaint in an effort to characterize attorneys' fees and expenses as compensatory damages, citing 42 U.S.C. § 1988 and positing that a "claim for attorneys' fees and expenses . . . is an authorized claim of damages in civil rights actions." (Id. at 16.)

In its brief in opposition, Northfield contends that Plaintiffs "mischaracterize the nature of the Anderson Lawsuit in order to bring it within the [Policy.]" (Doc. No. 35 at 10–11.) Specifically, Northfield faults Plaintiffs for reading the recovery of unpaid benefits into the complaint when "the relief sought therein did not, in fact, include unpaid foster care payments" (id. at 12) and for equating a claim for attorneys' fees with compensatory damages when, "[i]n actuality, 42 U.S.C. § 1988 . . . explicitly characterizes such fees as costs, as opposed to damages" (id.). Acknowledging that the "complaint seeks 'Plaintiffs' costs and reasonable attorney's fees,'" Northfield nevertheless urges that "the plain language of Endorsement 17 should apply here to exclude coverage." (Id. at 12.)

The first paragraph of the underlying complaint describes the lawsuit as one seeking declaratory and injunctive relief:

> This civil rights class action seeks declaratory and injunctive relief to redress defendant state and county officials' failure to provide mandated financial support, in the form of per diem foster care payments, to abused and neglected children who are in the care of plaintiff care givers, who are all relatives or close friends of the children in their care.

14

(Doc. No. 29-4 at 3 ¶ 1.)  The third paragraph of the complaint again describes the lawsuit as one seeking declaratory and injunctive relief: "Plaintiffs bring this action for declaratory and injunctive relief on behalf of themselves and a putative class of similarly situated kinship care givers."  (Id. at 3 ¶ 3.)  So, too, the sixth paragraph (id. at 5 ¶ 6 ("Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 1983.")) and the thirty-ninth paragraph (id. at 16 ¶ 6 ("As a result, declaratory and injunctive relief with respect to the entire class is appropriate.").  In fact, nowhere in the complaint is the lawsuit described as one seeking legal relief or compensatory damages.  (See generally Doc. No. 29-4.)

The complaint concludes with a prayer for various forms of relief:

a.      That this Court assume jurisdiction of the action;

b.      That this Court certify this as a class action under Fed. R. C[iv.] P. 23(a) and 23(b)(1), 23(b)(2);

c.      That this Court issue a *declaratory judgment* that the State and County defendants' policy and practice of failing to notify plaintiff kinship care givers of their eligibility for per diem foster care payments, and/or failing to pay any per diem foster care reimbursement, . . . violates Title IV-E of the Social Security Act . . . as well as Due Process and Equal Protection Clauses of the United States Constitution;

d.      That this Court issue a *declaratory judgment* that the County defendants' policies and practices of failing to notify plaintiff kinship care givers of their eligibility for per diem foster care payments, and/or failing to pay any per diem foster care reimbursement, . . . violates Pennsylvania law and regulations;

e.      That this Court issue a *declaratory judgment* that plaintiff kinship care givers who have been or will in the future serve as kinship care givers . . . are entitled to foster care

reimbursement payments at the same per diem rate as non-kinship care givers;

f.      That this Court issue *preliminary and then permanent injunctive relief* enjoining State and County defendants:

(1)     from engaging in the practices complained of in this Complaint . . . and

g.      That this Court order State and County defendants to audit their records and *notify eligible class members of their potential right to file claims and seek the recovery of past unpaid benefits retroactively in state court or through state administrative proceedings*;

h.      That this Court award plaintiffs' costs and reasonable attorney's fees; and

i.      That this Court award such additional or alternative relief which this Court deems just, proper, or equitable.

(Id. at 32–35 (emphasis added).)  Consistent with the foregoing allegations, the kinship care givers requested that the district court issue a declaratory judgment and order preliminary and permanent injunctive relief.  (Id.)

The Court finds no support for Plaintiffs' assertion that "[t]he gist of the action was for the recovery of past foster care per diem payments." (Id. at 15.)  To the contrary, the prayer for relief impliedly excludes the possibility of immediate recovery in that it explicitly contemplates future proceedings for the recovery of unpaid benefits, asking the district court to order the defendants "to audit their records and notify eligible class members of their potential right to file claims and seek the recovery of past unpaid benefits retroactively in state court or through state administrative proceedings."  (Id. at 34.)

As to Plaintiffs' assertion that the closing prayer for "additional or alternative relief" somehow loosed the Anderson Lawsuit from its equitable underpinnings and brought it within

16

the scope of coverage, such language is boilerplate and does nothing to alter the basic nature of

the underlying complaint.  See Lewis v. Hyland, 554 F.2d 93, 103 (3d Cir. 1977) (refusing "to

interpret the catch-all phrase 'and such other relief . . . ' to include a claim for legal damages" in

an action brought under 42 U.S.C. § 1983); see also Leuthner v. Blue Cross and Blue Shield of

Northeastern Pennsylvania, 454 F.3d 120, 127 (3d Cir. 2006) (describing request for "[a]ny other

legal and equitable relief as the Court may deem just and necessary" as boilerplate).  It is not a

claim for damages, but an inchoate demand, the purposes of which are, first, to allow revision of

a prayer for relief in light of facts later adduced and, second, to permit a court to fashion some

form of relief, initially unspecified, in the course of an action.  Unsurprisingly perhaps, Plaintiffs

fail to cite a single case in support of their contention, whereas exhaustive research by the Court

reveals numerous cases where courts have taken the opposite view.  See, e.g., H.L. Libby Corp.

v. Fireman's Fund Ins. Co., No. 03-601 2006, WL 2054089 (W.D. Pa. July 24, 2006) (finding

that the "boilerplate phrase, 'costs, attorney's fees and other and further relief as the Court deems

just and proper,' is [not] in itself a claim for damages"); Continental Ins. Co. v. Alperin, Inc., No.

97-1008, 1998 WL 212767 (E.D. Pa. Apr. 29, 1998) (holding that the underlying "complaint's

boilerplate request for 'other and further relief' did not give rise to coverage."); Upper Allen Tp.

v. Scottsdale Ins. Co., No. 92-1557, 1994 WL 772759 (M.D. Pa. Apr. 29, 1994) ("It cannot fairly

be said that such a backstop provision, which does not itself request any particular relief but

rather permits some further type of relief (one that is presently unspecified) to be fashioned by

the court during or at the end of a legal proceeding, had made a claim . . . for money damages."

(citing Employers Ins. of Wausau v. Bodi-Wachs Aviation Ins. Agency, Inc., 846 F. Supp. 677,

686 (N.D. Ill. 1994); Federal Deposit Insurance Corporation v. Sanders, 785 F. Supp. 528, 529

(W.D. Pa. 1992) (holding that a "boilerplate request for 'other and further relief as the court deems just and proper' [did] not alter the basic equitable nature of [plaintiff's] claims.").

As to Plaintiffs' further assertion that the kinship care givers sought compensatory damages in the form of "costs and reasonable attorney's fees" (Doc. No. 30 at 14–15; <u>see also</u> <u>id.</u> at 9), neither costs nor attorney's fees are properly construed as compensatory damages because neither one is meant to remedy plaintiffs for past injuries.  <u>See</u> James W. Moore et al., <u>Moore's</u> <u>Federal Practice</u>, § 54.151[2][d] ("In the vast majority of cases, an award of attorney's fees is not an element of damages to be proved at trial . . . ."); <u>compare</u> <u>Black's Law Dictionary</u> 372 (8th ed. 2004) (defining "costs" as "[t]he expenses of litigation, prosecution, or other legal transaction") <u>with</u> <u>id.</u> at 416 (defining "damages" as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury") <u>and</u> <u>id.</u> (defining "compensatory damages" as "[d]amages sufficient in amount to indemnify the injured person for the loss suffered").  <u>See also</u> <u>Motorola,</u> <u>Inc. v. Fed. Ex. Corp.</u>, 308 F.3d 995 (9th Cir. 2002) ("We recognize that costs and attorney's fees are not 'damages,' whereas prejudgment interest is so characterized." (citing <u>Monessen Sw.</u> <u>Ry. Co. v. Morgan</u>, 486 U.S. 330, 335 (1988)); <u>United States v. Sec. Mgmt. Co., Inc.</u>, 96 F.3d 260, 269–70 (7th Cir. 1996) (holding that attorneys' fees awarded pursuant to 42 U.S.C. § 1988 are not damages) ("Where the obtaining of attorneys' fees is expressly provided for by statute, a request for attorneys' fees is not a request for 'damages.'").  The provision for "a reasonable attorney's fee as part of the costs" in 42 U.S.C. § 1988(b), cited by Plaintiffs to adverse effect, only underscores the categorical relationship between costs and attorney's fees and, in turn, their being distinct from compensatory damages.  <u>See</u> 42 U.S.C. § 1988(b); <u>see also</u> <u>Sullivan County,</u> <u>Tenn. v. Home Indem. Co.</u>, 925 F.2d 152, 154 (6th Cir. 1991) ("[W]hen an act of Congress

unambiguously assigns such fees to one category, the courts are not free to pretend that Congress

has assigned them to the other."). Attorney's fees are not "damages" when they are sought in the

same action in which the attorney's services are to be rendered. Id. ("In the language of the

law, . . . there is a clear distinction between 'costs' and 'damages.'"). As the Eastern District of

Pennsylvania observed in considering whether a party could bring suit to recover costs and

attorney's fees where jurisdiction would not lie for an action seeking "money damages":

> An award of costs and fees is not a damage award. Instead, it simply
> repays the labor involved in striving to obtain a damage award.
> Unlike a damage award, an award of costs and fees in no way
> rectifies the grievance initially giving rise to a case; it does
> not . . . "substitute for a suffered loss." Rather than being
> compensation, costs and fees arise solely as incidents of the effort to
> achieve compensation. The underlying idea is to regain specific
> monies expended rather than to find a surrogate for what has
> unfortunately been denied.

Bruch v. U.S. Coast Guard, 749 F. Supp. 688, 692 (E.D. Pa. 1990) (quoting Maryland Dep't of

Human Resources v. Department of Health and Human Services, 763 F.2d 1441, 1446 (D.C. Cir.

1985). Ultimately, the district court concluded that money damages were not at issue and

exercised jurisdiction. Id.

The fact that the relief sought would require one party to pay money to another will not

transform an equitable action such as the Anderson Lawsuit into an action at law for damages.

See Bowen v. Massachusetts, 487 U.S. 879, 893 (1988) ("Our cases have long recognized the

distinction between an action at law for damages—which are intended to provide a victim with

monetary compensation for an injury to his person, property, or reputation—and an equitable

action for specific relief—which may include an order providing for the reinstatement of an

employee with backpay, or for the recovery of specific property or monies . . . ."). Indeed, as the

Supreme Court has explained, even "relief that [would] order[] a town to reimburse parents for educational costs that Congress intended the town to pay is not 'damages'"—a situation not unlike the one at hand—where reimbursement would "merely require[] the Town to belatedly pay expenses that it should have paid all along and would have borne in the first instance." Id. at 893–94 (quoting School Committee of Burlington v. Dept. of Ed. of Mass., 471 U.S. 359, 370–371 (1985)).  Thus, even if the kinship care givers had sought the recovery of unpaid benefits, which they did not, an action seeking reimbursement of monies to which a party is already entitled but which the defendant has disallowed, as opposed to monetary damages in compensation for losses suffered as a result of the disallowance, is an equitable action under established Supreme Court precedent.  See, e.g., Bowen v. Massachusetts, 487 U.S. 879 (1988); School Committee of Burlington v. Dept. of Ed. of Mass., 471 U.S. 359 (1985). Notwithstanding the inclusion of a prayer for costs and attorney's fees in the underlying complaint, the Anderson Lawsuit was, as a matter of law, an equitable action seeking declaratory and injunctive relief.  (See Doc. No. 29-4 at 3 ¶ 1.)  Therefore, because the action sought "solely declaratory, injunctive, or equitable relief, including but not limited to any attorney's fees or expenses" (Doc. No. 29-9 at 2), of the sort excluded by the endorsement, the Court finds that Northfield had neither a duty to defend nor a duty to indemnify PCoRP under the Policy.

## V.     Conclusion

For the foregoing reasons, the Court finds that Northfield had no duty to defend or indemnify PCoRP in connection with the Anderson Litigation because the plaintiffs in that case sought only declaratory or injunctive relief, which falls outside the scope of the Policy's coverage.  For this reason, Plaintiff's motion for summary judgment will be denied and

Defendant's motion for summary judgment will be granted and the clerk will be directed to enter judgment in its favor.  An order consistent with this memorandum will issue.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PENNSYLVANIA COUNTY** | : | |
| **RISK POOL (PCORP), COUNTY** | : | **Civil Action No. 1:07-cv-00898** |
| **OF MONROE, PENNSYLVANIA,** | : | |
| **and COUNTY OF BEAVER,** | : | **(Chief Judge Kane)** |
| **PENNSYLVANIA,** | : | |
| | : | |
|     **Plaintiffs and** | : | |
|     **Counterclaim Defendants** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **NORTHLAND INSURANCE,** | : | |
| | : | |
|     **Defendant and** | : | |
|     **Counterclaim Plaintiff** | : | |

<u>**ORDER**</u>

AND NOW, this 27th day of February 2009, upon due consideration of the pending cross motions for summary judgment filed by Plaintiffs (Doc. No. 29) and Defendant (Doc. No. 32), and for the reasons fully set forth in the within memorandum, IT IS HEREBY ORDERED THAT Defendant Northfield Insurance's motion for summary judgment (Doc. No. 32) is GRANTED. IT IS FURTHER ORDERED THAT Plaintiffs' motion for summary judgment (Doc. No. 29) is DENIED. The Clerk of Court is directed to enter judgment in favor of Defendant Northfield Insurance and to close the file.

                     S/ Yvette Kane_____
                     Yvette Kane, Chief Judge
                     United States District Court
                     Middle District of Pennsylvania